HIRAM T. ADAMS, Administrator, Plaintiff in Error, v. ABRAM S. GUICE, Administrator, Defendant in Error.

1. EVIDENCE: LOST INSTRUMENT PROVED BY PAROL.—It is competent to prove by parol evidence, the contents of a written instrument, when the original is destroyed, or lost, so that after diligent search it cannot be found.

2. SAME: ALLEGATIONS OF PLEADING.—Under the New Pleadings Act of 1850, every allegation of the complaint not denied by the answer, is taken as true, for the purposes of the action.

3. STATUTE OF LIMITATIONS: ADVERSE POSSESSION.—No length of time will bar the right of the owner to recover his property, in possession of another, unless such possession be adverse.

4. ADVERSE POSSESSION : WHAT IS.—Possession of property is not adverse, unless it be under a claim of title.

5. NEW TRIAL: REMEDY FOR IMPROPER GRANT OF.—If a new trial be improperly granted by the Circuit Court, and a bill of exceptions taken thereto, this court will establish, the verdict and render judgment thereon, when the cause is brought up regularly after final judgment below.

In error from the Circuit Court of Jefferson county. Hon. Stanhope Posey, judge.

William Kinnisson, was the father of Nathaniel Kinnisson, the plaintiff's intestate; and Mary Kinnisson, the defendant's intestate, was the mother of said Nathaniel. William died in 1843, Nathaniel in 1847, and Mary, since the commencement of the suit. The negro Jude, who was conveyed by the bill of sale, from William to Nathaniel, in 1814, and her offspring, were never delivered by said William to Nathaniel, but remained in the former's possession until his death, except that Nathaniel, from 1830 until a short time after William's death, cultivated the farm, the one on which he resided, and the one on which said William resided with the negroes, and managed and controlled them. After William Kinnisson's death, Nathaniel having a misunderstanding with his mother, Mary Kinnisson, left the negroes in her possession, where they remained until 1847, when said Nathaniel went back and resided with his mother until his death. The proof as to ownership, and the character of the several possessions of William, Mary and Nathaniel Kinnisson, is fully set out in the opinion of the court. Objection was made on the trial to the admission of the deposition of Alsey Matthews, because the existence and loss of the bill of sale were not sufficiently proven. On this point, the evidence offered to the court was as follows: The plaintiff testified, that he believed a bill of sale was executed by William Kinnisson to Nathaniel, in 1814. That it remained in possession of said Nathaniel, until about five years before his death, when it was taken from him by his wife, Lydia Kinnisson. That since his appointment as administrator, he has been making constant efforts to ascertain the residence of said Lydia, and to procure possession of said bill of sale, but has not been able to do so. He also proved by Ann E. Kinnisson, that the said Lydia was her mother, and that she resided for three years previous to September, 1851, at Baton Rouge, Louisiana, and then and there died, and that her goods and effects were sold shortly after her death, and purchased by some one unknown to witness, and that for some years prior to her death, said Lydia had no communication with her relatives in Claiborne county, in this state. That for a number of years prior to her death, said Lydia had been unsettled, and had resided at various places in this state, and in Tennessee, Arkansas and Louisiana. That whilst said Lydia

resided in Vicksburg, she had in her possession a certain paper in writing, the contents of which were unknown to witness, as she was then too young to read. That she preserved it in a certain box, in a certain bureau drawer, which was broken open during said Lydia's absence on a visit, and the paper taken away, and that search had afterwards been made for it, but it could not be found, nor could the person who took it be discovered.

John Brown, stated that in 1848, he heard Mary Kinnisson say, that William Kinnisson had made a bill of sale of the negroes to Nathaniel, but it was where they could not get it. John S. Ingram, proved a conversation with Mary Kinnisson, in substance the same.

The first verdict was rendered in favor of the plaintiff, which on motion was set aside, and a new trial awarded. To this, plaintiff excepted. There was then a change of venue to Jefferson county, and a verdict and judgment were rendered for defendant.

The complaint alleged that the slaves were worth $300 hire per annum. The answer on this subject, contained the following: "Defendant denies that she is liable to pay hire for said slaves to said plaintiff."

*Geo. V. Moody*, for plaintiff in error, after reviewing the testimony, made the following law points:—

1. The deposition of Alsey Matthews was correctly admitted. The bill of sale was found to have once existed, and to be now lost or destroyed. 4 Phillips, Ev. 438; 2 Ib. 412, 413; 1 Greenl. § 558.

2. As to the question of the acts of limitation, it is held that one in possession under title of another, in order to change the character of that possession and render it adverse, must do some open and unequivocal act evincing his intention; and this act, to affect the true owner's title, *must* be brought home to his knowledge at the time. *Knight* v. *Bell*, 22 Ala. 206; *Harrison* v. *Pool*, 16 Ib. 167; 2 J. J. Marshall, R. 163; Angell, Lim. 401, 402, 427, §§ 19, 404, 481, 501; 5 How. Miss. R. 520; 14 How. S. C. R. 289.

Every presumption of law is to be made in favor of the true

owner, and a bare possession, is evidence of no more than the fact of a present occupation by right; for the law never presumes a wrong. Angell, Lim. 408, § 6.

The burthen of proving adverse possession, is on the person alleging it. *Rung* v. *Schoenberger*, 2 Watts, 23–27; *Jones* v. *Porter*, 3 Pen. & Watts, 132; 2 Smith, Lead. Cas. 416.

Questions of the fact of adverse possession, are for the determination of the jury alone. But the circuit judge granted the new trial and set aside the verdict, solely upon the erroneous supposition that the jury ought, from length of possession, to have presumed a title or grant. 1 Greenl. § 46, and 5 Phil. 267, have laid down the law on this subject, thus : " A conveyance between private individuals will be presumed, where the party, who asks the benefit of the presumption, has proved a title to the beneficial ownership—a long possession, not inconsistent therewith—and has made it not unreasonable to believe that the deed of conveyance, or other act essential to title, was duly executed. Where these merits are wanting, the jury are not advised to make the presumption. 11 East, 478.

The doctrines above cited show, when applied to the facts, that the verdict was according to law and evidence, and that we are entitled to a judgment thereon in this court; for we proved a clear title and possession thereunder in 1811 or 1812, and in 1832–1834, and in 1847, 1848; that plaintiff's intestate died in possession of the property. There was no proof of any ownership in William or Mary Kinnisson, or in any other person than plaintiff's intestate; nor was there any adverse possession, as the jury said by their verdict; and it was their province to speak on that point, and not the province of the court; and we insist that this court ought to render judgment on this verdict, because it is just, and because it will in all probability occur, that before we can get another trial our witnesses may be dead—some are already so ; and having established our right legally, we ought not to be deprived of it, on account of the manifest error of the court below.

3. And we insist further, it is the true rule, in relation to setting aside a verdict of a jury, that unless it very clearly appears that the verdict is wrong, the court will not disturb it. This is

the rule laid down by this court in a number of cases. *Lefloe* v. *Justice*, 1 S. & M. 381; *Dickson* v. *Parker*, 3 How. 219; *Harris* v. *Halliday*, 4 Ib. 338; *Collins* v. *Money*, 4 Ib. 11; *Fisher* v. *Leach*, 10 S. & M. 313; *Watson* v. *Dickens*, 12 Ib. 608; *Mann* v. *Manning*, Ib. 615.

This court will, in a case where the verdict has been improperly set aside by the inferior court, and upon new trial the jury have found the other way, set aside the last verdict, and establish the first. *Ross* v. *Garey*, 7 How. 47; *Moore* v. *Ayres*, 5 S. & M. 310.

*Thomas Reed*, for defendant in error.

This suit was brought by petition; to which defendant's intestate filed an answer, and defendant adopted it as his own. It was for the recovery of Jude, and her four children, Ferdinand, Amanda, Amelia, and Cicero. The facts are fully set forth in the abstract. There was a verdict for plaintiff in error rendered at September term, 1852, and new trial granted.

1. The first reason that we think a new trial was *properly granted* is, that at that trial the loss of the supposed bill of sale, and the contents of the bill of sale, were not sufficiently proved. The witness, Alsey Matthews, did not see it; she only thought she saw—she did not read it. It was read to her; and she does not pretend to say whether the bill of sale she speaks of conveyed an absolute, or only a life estate, or whether it was conditional—or what it was. Her testimony was very uncertain. And then its loss was not fully accounted for; for it was last seen in possession of Lydia, the wife of the plaintiff's intestate. It was not shown that the supposed bill of sale was genuine, or was in any respect a complete sale; for, by the proof, it was signed by both parties, and may have been a mere agreement.

Positive and uncontradicted evidence ought to have been produced, of the due and legal execution of the sale, and its contents. 1 Greenl. 557, 558; Ib. 84, 575.

2. The first verdict was clearly against the weight of evidence. The defence was, adverse possession of three or more years, the proof by all the witnesses for the defence, and Alsey Matthews

herself, that William Kinnisson, the husband of Mary, had been in the possession of Jude from her birth, had always claimed her, had exercised acts of ownership over her during some eighteen years, subsequent to the time she was said to have been sold by him, to Nathaniel: that Nathaniel said in 1834, that he did not own Jude and her children : that he was present when they were appraised as his father's property, in 1833, and acquiesced in the appraisement—setting up no claim whatever to them.

The proof was also, that Mrs. Kinnisson had continued in the possession of them to her death—from 1833, until the suit in 1850 : that Nathaniel Kinnisson had never taken them away, but left them there when he went away in 1835 : that she exercised acts of ownership over them, and control : that Nathaniel said to the witness, Trimble, in 1848, that he was to get one-third of the crop for his services.    Clearly, if even there had been proof of a sale in 1814, this long adverse possession of William and Mary Kinnisson had ripened into a title; but there was no sale and delivery as required by law, to pass title and property.

3. The verdict of the jury gave $1316.33, damages for the hire of the negroes, when there was not a particle of proof that their hire was worth anything.    The answer of the defendant, denied any indebtedness whatever.

4. The court, on the trial, gave the following instruction, which was clearly erroneous: "If the jury find for the plaintiff, they will calculate the hire of said slaves, according to the valuation of the hire as stated in the petition, at the rate of three hundred dollars per year."

There was a distinct denial of indebtedness, on the part of defendant, in the answer, and no proof on the subject.    But even if there had been evidence of the value of the hire of the negroes, before the jury, the instruction would not have been law ; for it directs them as to what kind of a verdict they shall render. It debars them from weighing the testimony, but instructs them as to the terms of their verdict.

HANDY, J., delivered the opinion of the court.

This was an action at law, brought by the plaintiff in error,

against the intestate of the defendant in error, in the Circuit Court of Franklin county, to recover certain slaves, and hire therefor. The defendant below, in his answer denied the title of the plaintiff, or any liability for hire, and relied upon an adverse possession of more than three years, as a bar to the action. The plaintiff replied, denying the adverse possession. The case was tried in Franklin county, at September Term, 1852, and a verdict rendered for the plaintiff. A motion for a new trial was made and sustained, and the *venue* was then changed to Jefferson county; and a new trial took place in the Circuit Court of that county, at April Term, 1853, which resulted in a verdict and judgment for the defendant. The plaintiff thereupon moved for a new trial, which being overruled, he excepted, and has presented his writ of error.

To the action of the court, in sustaining the motion for a new trial, after the first verdict, the plaintiff took a bill of exceptions, which sets out all the evidence adduced on the trial.

It is now insisted by the plaintiff in error, that it was error to grant the new trial, and that the verdict first rendered should stand, and judgment be rendered upon it in this court, for the plaintiff. And it therefore becomes necessary to examine the evidence adduced on the first trial, and to determine whether by it, the jury were justified in their verdict.

The title of the plaintiff's intestate rested on a bill of sale, alleged to have been executed some time about the year 1814, by William Kinnisson to his son Nathaniel, the plaintiff's intestate; and, after reading the affidavit of the plaintiff, and adducing other testimony to show that such an instrument had been executed, and that it had been lost or destroyed, the plaintiff introduced Alsey Matthews, as a witness, who proved that she was acquainted with William and Nathaniel Kinnisson, about the time of the alleged date of the bill of sale: that William was then the owner of one of the slaves in controversy, who has since become the mother of the others sued for: that she heard him say, that he had sold the slave to his son Nathaniel, for the sum of $350, and had given him a bill of sale for her, and that the purchase-money was paid by Nathaniel to a third person, who is named, to whom William

owed a debt: that she saw the bill of sale in the possession of Nathaniel, shortly after it was made, and heard him read it, he being then her son-in-law, and that she saw the slaves in the possession of Nathaniel, in the year 1830 or 1831.

The plaintiff next introduced one Ingram, who testified, that in the spring of 1848, he had gone with the plaintiff to the house of Mary Kinnisson, the defendant's intestate, and heard him make demand of her of the slaves; and that she replied to him, to take them if he could find them, but that she had put them out of the way, and would not give them up : that on the same occasion, and after the plaintiff had left the room, she stated to the witness, she knew there had been a bill of sale from William to Nathaniel for the slaves, but that it was where they could not get it.

The plaintiff then introduced one Magee, who testified, that he was the grandson of William and Mary Kinnisson, the defendant's intestate : that William was infirm and bedridden for some two years before his death, which took place in 1833, and during that time Nathaniel was on the plantation of William, in the possession of the slaves in controversy, and making crops: that in 1847, the defendant's intestate sent for Nathaniel to come and take them under his control: that they had become unruly, and she could not manage them : that witness did not know in what capacity Nathaniel had the slaves in 1847 and 1848 : that Nathaniel, in the spring of 1848, had a horse or two on the place which were not there before he went there, and had made a crop in 1847 with the slaves : that in 1833 there were misunderstandings between Nathaniel and his mother, who was then old and cross in her disposition, and that he then left her house, and did not return there to reside until 1847 ; and that he remained there and in possession of the slaves, until his death in 1848.    And this was the substance of the plaintiff's evidence.

The defendant then introduced one Rowland, who testified, that in the year 1834 or 1835, he heard a conversation between Nathaniel Kinnisson and a third person, in which Nathaniel stated that he had no more claim upon the slaves than that person, and that he had nothing to do with them.    On cross-examination, he stated, that he was about thirteen or fourteen years old when this

conversation occurred, and had not thought of it since it took place, until some time in January or March, 1852, when, in riding along the road with the defendant, he recollected it, and did not know that he heard all the conversation.    The defendant also introduced the inventory of William Kinnisson's estate, showing that the slaves were mentioned therein, and proved that Nathaniel Kinnisson was present when the mother of the slaves was inventoried in 1833, as the property of William Kinnisson, and that he made no objection thereto, nor any claim to the slaves.    He also proved by one Campbell, that he had had claims against Nathaniel in his lifetime, and had collected nothing on them; and by one Trimble, that he heard Nathaniel say in 1848, when he was at the house of Mary Kinnisson, that he was to manage the slaves and make a crop, and get one-third of it.    He also proved by one Martin, that Mary Kinnisson had possession of the slaves fifteen or eighteen years, but did not know that she ever claimed them in the presence of Nathaniel: that Nathaniel was working them in 1832 and 1833, on William Kinnisson's place, and on a place near that: saw them going and returning from one of said places to the other, under the control of Nathaniel; William and Mary also exercised acts of ownership over them, but has seen such acts of ownership frequently exercised by persons not the owners of slaves.    And this was in substance, all the evidence on the part of the defendant.

The motion for a new trial appears to be on two grounds.    First, that the verdict was contrary to law and evidence, and second, that the court erred in admitting the deposition of Alsey Matthews.

The only error in the instructions of the court suggested, is in relation to the instruction, that if the jury found for the plaintiff, they should calculate the hire of the slaves at the rate of three hundred dollars per year, the value stated in the complaint.    But there was no error in this: the value of the yearly hire of the slaves was stated in the complaint, and was not denied in the answer; and under the rule established by the statute of 1850, in relation to pleadings, this was to be taken as an admission of the allegation.    Nor does there appear to be any valid ground of objection to the admission of the deposition mentioned.

We are to consider, then, whether the verdict was contrary to the evidence. And this involves two considerations; first, whether there was sufficient evidence to show that the mother of the slaves had been sold to the plaintiff's intestate, and second, if that be shown, whether the right is barred by the adverse possession of the defendant's intestate.

Upon the first point, there can be but little room for doubt. The sale by William Kinnisson to Nathaniel, is clearly proved both by the witness Alscy Matthews, and by the acknowledgment of Mary Kinnisson, that the bill of sale to him for the slave had been in existence, but was lost or destroyed. Against such evidence, the jury might well have considered that the circumstances shown in behalf of the defendant were entitled to but little weight. The testimony of Rowland as to Nathaniel's admissions was clearly entitled to no consideration. The failure of the intestate to assert his claim or to make objection when the property was inventoried as belonging to the estate of his father, may be explained on the ground, that although he knew that the appraisers were making an inventory of his father's property, it does not appear that he was aware that they included the slave in controversy, as a part of that estate, and he may very possibly have been ignorant that it was so inventoried. His declaration to Trimble, that he was to manage the slaves, and make the crop, and get one-third of it, does not prove that the slaves in controversy were not claimed by him. He appears to have been on the plantation owned by his mother, Mary Kinnisson; and it is reasonably to be inferred from the circumstances, that they were carrying on the plantation by their joint means and force, and that he was to receive the proportion of the proceeds stated by him. The particulars of the transaction are not shown; but the statement as proved by this witness, does not show that he did not claim the ownership of the slaves in controversy.

We think, therefore, that the verdict of the jury upon this point was well justified by the evidence.

Was the plaintiff's right, then, barred by the adverse possession of the defendant's intestate?

It will be observed, that there is no evidence showing that Mary

Kinnisson set up any right or title to the slaves. They are shown to have been in her possession from about the time of her husband's death until the year 1847, during which time it does not appear that she set up any claim to them, nor that the administrator of William Kinnisson claimed any ownership or control of them. It does not appear under what right or authority they were in her possession; whether by permission of the plaintiff's intestate, which is the most probable under the circumstances, or under any authority from the administrator of William Kinnisson. But it appears that during the long time she had possession of the slaves, she was not known to have claimed title to them in the presence of the plaintiff's intestate, or otherwise; and it is positively proved, that when the plaintiff went to demand them of her, she set up no right in herself, but virtually admitted the right of the plaintiff—saying that he could take them if he could find them, but that she had put them out of the way: and on the same occasion, she acknowledged that she knew of the bill of sale to the plaintiff's intestate, but that it was where it could not be produced. If the declaration, that she had put the slaves where they could not be found, could be regarded as the assertion of an adverse claim, that was not made until the spring of 1848, which was less than three years before the commencement of the suit; and it appears that the possession of the plaintiff's intestate was restored in 1847, and that he continued in possession until his death in 1848. There is no evidence that she claimed title before 1848, and the probability is strong that she did not make any such claim.

It is well settled that, in order to constitute an adverse possession, so as to confer a right to the party holding it, or rather, so as to bar a recovery by another party claiming title, the possession should be *under a claim of right.* The reason is said to be, that it may not have been originally taken, or subsequently held, with an intention to claim the property as owner; and may have been with a perfect understanding between the possessor and the proprietor, that the latter is all the time to be regarded as such; or in other words, that the possession may be regarded as *permissive.* Angell, Lim. 400, § 5, and cases there cited.

In addition to the absence of all claim on the part of Mary

Kinnisson, the testimony tends to show that her possession, before 1847, was merely permissive. It is proved that Nathaniel left the place on which she resided in 1833, in consequence of misunderstandings between him and his mother, who was old and ill-tempered: and the only time she is proved to have spoken of the property, she admitted that it belonged to Nathaniel. This was in the year 1848; and it is not to be supposed, if she claimed title to the property, or really had any right to it, that she would have failed to assert her right, when it was demanded by the plaintiff. From these circumstances, the probability is strong that her possession, previous to the year 1847, was merely permissive, and understood to be subject to the title of Nathaniel.

We do not think, therefore, that the plaintiff's title could be held to be barred, on the ground of adverse possession.

If the foregoing views be correct, it follows, that the original verdict was proper, and that it was error to set it aside, and to grant a new trial. The judgment, therefore, upon the new trial, must be reversed, and a judgment rendered here on the original verdict, for the plaintiff in error; which is ordered accordingly.