J. H. LEAVENWORTH *v.* W. D. REEVES.

[64 South. 660.]

1. ADVERSE POSSESSION. *Color of title. Void tax deed. Constructive possession. Code 1906, section 3095. Notice to owners. Evidence. Sufficiency. Payment of taxes. Claim of title. Effect.*
   Code 1906, section 3095 providing that three years occupation of lands under a tax deed will bar a suit for the recovery of such lands, has no application, where lands owned by the state and not subject to sale for the non-payment of taxes are sold as a tax deed conveying such lands is wholly void.

2. SAME.
   Where the defect in a tax deed does not arise by reason of the defective execution by the state's administrative officers of a power to assess and sell for taxes, but by reason of the fact that the legislature had not conferred, or attempted to confer, any such power upon them at all, in such case Code 1906, section 3095 has no application.

3. ADVERSE POSSESSION. *Constructive possession.*
   Where the title is void as to part of the lands conveyed, the occupation of that part, to which the grantee had title, will not give the grantee constructive possession of the other part to which he had no title, so as to disseize the real owner.

4. ADVERSE POSSESSION. *What constitutes. Notice to owner.*
   Where land is of such a character as not to admit of permanent and useful improvement, actual occupation, cultivation and resi-

dence are unnecessary to constitute actual possession in the sense of being adverse to the true owner; but whatever the character of the land may be, the possession, to be adverse in the legal sense, must be evidenced by such acts as are calculated to arrest the attention of the true owner and indicate to him that the land is being appropriated to the use of another under claim of ownership.

5. SAME.

The acquiescence of a landowner in a mere trespass, however long continued, cannot have the effect of divesting him of his title, unless the trespass is of such a character as to comply with all the elements of an adverse possession.

6. ADVERSE POSSESSION. *What constitutes. Payment of taxes.*

The payment of taxes cannot help out a defective possession, but simply constitutes evidence of claim of ownership, and such a claim, unaccompanied by possession, will avail nothing.

7. SAME.

Where the owner of land knows that another is paying the taxes on his land, this would be some evidence that he knew that such party was asserting some claim of ownership, but such claim, unaccompanied by possession, will avail nothing.

8. SAME.

A landowner may know that another is claiming his land, but such claim, can never ripen into a title, unless it is accompanied for ten years by a continuous, hostile, actual and exclusive possession.

APPEAL from the chancery court of Coahoma county. HON. M. E. DENTON, Chancellor.

Bill by J. H. Leavenworth against W. D. Reeves. From a decree dismissing the bill, complainant appeals.

The facts are fully stated in the opinion of the court.

*Maynard & Fitzgerald* and *Tim E. Cooper*, attorneys for appellant.

*D. A. Scott, A. D. Sommerville* and *E. M. Yerger*, attorneys for appellee.

Argued orally by *Tim E. Cooper*, for appellant and *D. A. Scott*, for appellee.

SMITH, C. J., delivered the opinion of the court.

Appellant filed his bill in the court below, claiming to be the owner of the land here in controversy, and alleging that appellee was engaged in cutting timber thereon, claiming the right so to do by virtue of a contract entered into by him with O. H. Johnson Hunting Club, which club also claimed the ownership of the land, and prayed that this contract be canceled as a cloud upon appellant's title, and appellee be enjoined from cutting the timber. From a decree dismissing this bill and dissolving the temporary injunction that had been granted thereon, this appeal is taken.

Appellant, by his evidence, disclosed a perfect record title to the property, and the attempt on the part of appellee is to establish title in the hunting club by adverse possession. In 1899, and for a number of years prior thereto, the land was owned by the state, having been acquired by it under various tax sales. In April and May of that year it was purchased from the state by Jeff Perkins and E. J. Sawyer with money furnished by appellant; they taking the legal title to themselves in trust for him. They afterwards conveyed it to John Lanning, and Lanning conveyed it to appellant.

In 1896, while owned by the state, the land was erroneously placed upon the assessment roll, and the person to whom it was assessed having failed to pay the taxes assessed thereon, it was, during the next year (1897) sold for the collection thereof to O. H. Johnson and others, who in 1900 sold it, along with other lands, to the hunting club. Appellee admits that this tax title is void, but claims that the club's title to the land has been perfected, both by reason of an actual occupancy of the land for more than three years, under section 3095 of the Code, and by reason of having been in adverse possession thereof for more than ten years.

Section 3095 has no application, for the reason that, as the land was owned by the state in 1896, it was not

then subject to taxation. The defect in this tax deed does not arise by reason of the defective execution by the state's administrative officers of a power to assess and sell for taxes, but by reason of the fact that the legislature had not conferred, or attempted to confer, any such power upon them at all, and to such a defect this statute has no application. The case of *Hoskins* v. *Railroad Co.,* 78 Miss. 771, 29 So. 518, 84 Am. St. Rep. 644, is conclusive of this proposition, and that case was not overruled by, and is not in conflict with, the case of *Hamner* v. *Lumber Co.,* 100 Miss. 349, as was expressly stated in the opinion rendered therein at page 434, 56 So. 466.

The cases of *Patterson* v. *Durfey,* 68 Miss. 779, 9 So. 354; *Carlisle* v. *Yoder,* 69 Miss. 384, 12 So. 255, and *Smith* v. *Leavenworth,* 101 Miss. 238, 57 So. 803, relied on by appellee, are not in point. In *Patterson* v. *Durfey,* the averment of the bill simply was that the land was assessed to, not that it was owned by, the levee board; while in *Carlisle* v. *Yoder* it did appear that the land was owned by the levee board, still, it was subject to county and other local taxes, and the sale thereof was for the collection of both state and county taxes. In *Smith* v. *Leavenworth,* the land was assessed to, but was not owned by, the state. An examination of the facts of that case will disclose that the land was sold to the state for the taxes of 1876. This sale, however, was considered by the attorney-general and treated by the court as being defective, and therefore as conferring no title on the state. The land, however, was thereafter carried on the assessment roll as the property of the state until 1881. In 1880 the attorney-general directed that the land be stricken from the auditor's list and certified back to the county wherein the sale for taxes was made. In 1881, while the land still remained improperly assessed to the state, the tax collector sold it for the taxes claimed to be due thereon for 1880. This sale the court held to be void; but, the purchaser having been in possession of

the land thereunder for more than three years, his title was held good under section 3095 of the Code. From this it appears that the land was subject to taxation in 1880, and therefore could have been assessed and sold for the taxes of that year, so that the defect in the sale therefore arose, not by reason of the lack of power in the state's administrative officers to assess and sell, but by reason of the defective execution of a power so to do. The land was simply erroneously assessed.

*Smith* v. *Leavenworth* is supported by both *Patterson* v. *Durfey* and *Carlisle* v. *Yoder*; and, while it is true that in *Hoskins* v. *Railroad Company* it was said that these cases, "so far as they are in conflict with this opinion, are overruled," an examination of them will disclose that they are not in conflict therewith. This is made clear by the language of one of the counsel for appellant in the case of *Hamner* v. *Lumber Company,* 100 Miss. 349, as will appear from his brief on page 367, 56 So. 466, on page 472. This language is as follows: "Now, it is manifest that all that was said in *Hoskins* v. *I. C. R. R. Company* related to the nonliability of the land to taxation, and the rule laid down was that the statute had no application where the land could not be taxed. · Judge TERRAL, proceeding, stated that there was no difference between the ownership of land by the Federal government and by the state or levee board or other municipal authorities, if the land in their hands was nontaxable. He evidently meant to say that the cases of *Patterson* v. *Durfey* and *Carlisle* v. *Yoder* were overruled only in so far as they conflicted with the rule thus announced. Now, as matter of fact, it is easy to show that there is no conflict between *Hoskins* v. *Railroad Co.,* on the one side, and *Patterson* v. *Durfey* and *Carlisle* v. *Yoder,* on the other. In *Patterson* v. *Durfey* it was not averred that the lands were owned by the levee board. It was only averred that they were assessed to the levee board, which might very well have been true, and yet they may

not have been owned by the board.  But in *Carlisle* v. *Yoder* it does distinctly appear that the lands were owned by the levee board.  Now, lands owned by the levee board were not exempt from taxation.  They were exempt from state taxes, but they were liable to county taxes and other local taxes.  They were sold both for the state and county taxes, and, of course, the sale was void if it had been attacked; but it was not attacked, and the purchasers were permitted to remain in possession.  Here was default on the part of the former owner.  His lands were liable to a part of the taxes for which they had been sold, and he sat by and permitted the purchaser to remain in possession.  The language of Judge Terral in *Hoskins* v. *Railroad Co.* makes it clear that what he had in mind was a sale of lands which were not liable to taxation at all.  He expressly says that section 2735 applies to sales of lands that are taxable and salable, and in which there is some defect in the proceeding relating to the assessment or sale; and he says in such cases the owner, knowing his land to be taxable, ought to be on his guard against their loss by any negligence of his own.''

The facts upon which the club's claim of title by adverse possession is based are about as follows: The deed from Johnson and others to the club, executed in 1900, conveyed, in addition to the land in controversy, a large body of other land, all of which is wild land, not suitable for agricultural purposes, and is valuable only for the timber thereon, and for use as a game preserve.  The club, as its name imports, is an association formed for the purpose of providing its members with facilities for hunting game.  In order to accomplish this purpose, the club, immediately after the execution to it of the deed from Johnson and others, built a hunting lodge on a portion of the land, to which its title is valid, some distance from the land in controversy, which lodge has since been annually occupied by its members and guests at intervals

during the hunting seasons. At all other times it has been vacant and the land unoccupied, except as will hereinafter appear. When the lodge was not occupied, it was visited at intervals by agents of the club charged with the duty of looking after it. The club also, shortly after receiving its deed, had the land therein conveyed surveyed and its lines "blazed." It has also, at different times, commencing shortly after the receipt by it of its deed, had trails or paths cut through the land aggregating "ten or fifteen" in number. Some of these trails were cut over the land in controversy, but when, where, or how many does not appear. It also built several bridges across sloughs and bayous, none of which, however, were on the land in controversy. These trails and bridges were for the use of the members of the club while hunting. Appellant owns, in addition to the land in controversy, a large body of other land contiguous to that of the club, and, with his permission, the members of the club hunted over his land to the same extent and in the same manner that they did over that belonging to the club. All of the land belonging to the club, including that in controversy, and also other land of appellant, was by the club posted, and trespassers warned off. These notices, according to the testimony of the president of the club, which were posted on the club's land and that in controversy, were signed, "The O. H. Johnson Hunting Club, by O. H. Johnson, President," and those posted on land belonging to appellant, other than the land in controversy, were signed "J. H. Leavenworth, by O. H. Johnson, Agent." The permission given the club by appellee for its members to hunt over his lands seems to have not been given until 1906.

In section 9, lots four, three, five, and six are contiguous, having one common corner. Lot four is owned by a man named Smith, or rather by his heirs, he being dead. Lot three is owned by the club, and was a portion of the land conveyed to it by the deed from Johnson and others.

And lots five and six are two of the lots here in contro-
versy.   At the time of the club's purchase, Smith was
living on lot four.   He was also cultivating a small por-
tion of lot three, and continued thereafter so to do, with
the permission of the club.   The river having encroached
upon lot four to such an extent that Smith's house was
in danger of caving into it, he moved his house back, and
by mistake placed it at the corner of the four lots men-
tioned; a part of the house being on lot three, a part on
four, and a part on five, and a part probably also on
six.   Smith afterwards ascertained that he had made this
mistake, obtained permission from both the club and ap-
pellee to let the house remain, and also obtained per-
mission from both to cut timber from and cultivate land
belonging to each.   It does not appear, however, that
either knew that the other had given this permission.
In consideration for the use of the land, Smith agreed
with each to supervise their respective lands and warn
trespassers therefrom.   Smith afterwards cleared up and
cultivated a garden south of his house and on lot five.
He seems not to have known the exact boundaries of
these lots, but was of the impression that the land south
of his house belonged to appellee.

It may be conceded, and the fact is, that the club has
been in the actual possession of at least that portion of
its land on which its lodge is situated, and that portion
of lot three cultivated by Smith, but it does not follow
from this that it has been in constructive possession of
all the land embraced within the calls of its deed, and
therefore in constructive possession of the land in con-
troversy.   Its deed conveyed to it a perfect title to the
land on which its lodge is situated, and that in lot three
cultivated by Smith, but conveyed no title at all to the
land in controversy, and the rule is, "if the title was
void as to part of the land conveyed, the occupation of
that part to which the grantee had title will not give the
grantee constructive possession of  the other  part to

which he had no title, so as to disseise the real owner."
*Mitchell* v. *Bond,* 84 Miss. 72, 36 So. 148; *Jones* v. *Gaddis,* 67 Miss. 769, 7 So. 489.

In order for the club's claim to the land in controversy
to have ripened into a perfect title by adverse posses-
sion, it must have been either in actual adverse posses-
sion of all of it, or in the actual possession of a part of
it under its color of title to all of it. Three of the ele-
ments of possession necessary in order that it may be
adverse are that it must be actual, hostile, and exclu-
sive. It is true that, where the land is of such character
as not to admit of permanent and useful improvement, as
is claimed to be the character of the land in the case at
bar, "actual occupation, cultivation, and residence are
unnecessary to constitute actual possession in the sense
of being adverse to the true owner;" but, whatever the
character of the land may be, the possession, to be ad-
verse in the legal sense must be evidenced by such acts
as are calculated to arrest the attention of the true
owner, and indicate to him that the land is being appro-
priated to the use of another under claim of ownership.
In *Ford* v. *Wilson,* 35 Miss. 504, 72 Am. Dec. 137, it was
said that the occupation must be of such character "that
the owner may be thereby notified to assert his title,"
and in Wood on Limitations, section 267, it is said that:
"When one enters upon land under color of title and
with claim of ownership, any acts of user which are con-
tinuous and which indicate unequivocally to the neighbor-
hood in which the land is situated that it is appropriated
exclusively to his individual use and ownership, such en-
try is sufficient to render the possession adverse."

Examined in the light of this rule, the possession, if
such it can be called, by the club of the land in controversy
was not of such character as to vest in it title by adverse
possession. Leaving entirely out of view the fact that,
during at least a portion of the time, appellant had given
it permission to use his land, and during that time might

have well believed that it was using the land in controversy by virtue of that permission, the mere fact that a path or two was cut through the forest on his land, and that it was hunted upon occasionally by members of the club, can hardly be said to be such an assertion of an intention to appropriate the land to the exclusive use of the club as to call upon him to interfere and assert his title. The acquiescence of a landowner in a mere trespass, however long continued, cannot have the effect of divesting him of his title, unless the trespass is of such character as to comply with all the elements of an adverse possession.

It is true that the taxes on the land in controversy were paid by the club, and not by appellant, but the payment of taxes cannot help out a defective possession, but simply constitute evidence of claim of ownership, and such claim, unaccompanied by possession, will avail nothing. It may also be true, as appellee contends, that appellant knew that the club was paying taxes on this land, and that fact, if true, is some evidence that he knew that the club was asserting some claim to the land, but claiming land and exercising acts of ownership over it are very different things. A landowner may know that another is claiming his land, but such claim, even in that event, can never ripen into a title, unless it is accompanied for ten years by a continuous, hostile, actual, and exclusive possession. The only effect of knowledge of such a claim by the true owner is to dispense with proof that the possession was open and notorious.

The case of *McCaughn* v. *Young*, 85 Miss. 277, 37 So. 839, relied on by appellee is not in conflict with the view here expressed, and the rule applied in that case is the same as the rule applied here. It may be that the facts of that case did not bring it within the rule, and to that extent the court was then in error, and conceding, for the purpose of the argument, that this is true, that fact is of no importance here, for the rule itself was left by

the court undisturbed. That case, however, was very different from the one here under consideration. The claimant there cut timber continuously from the land in controversy which adjoined his own, which fact was known to the true owner, who also knew that he was cutting and disposing of this timber under claim of ownership.

In so far as possession by Smith of a portion of lot five is concerned, it is conceded by counsel for appellee in their supplemental brief that the club cannot avail itself thereof, and the conclusion at which we have arrived renders it unnecessary for us to determine whether or not appellant could avail himself thereof.

The decree of the court below will be reversed, and decree here reinstating the injunction, making it perpetual, and directing that the contract by which the timber on the land in controversy was attempted to be sold by the O. H. Johnson Hunting Club to appellee be held for naught, in so far as the rights of appellant are concerned.

*Reversed.*