BALL, et al. *v.* MARTIN, et al.

Apr. 13, 1953

No. 38688          27 Adv. S. 10          63 So. 2d 833

*Henry Mounger, Jno. T. Armstrong* and *Hall & Callender,* for appellants.

*Williams & Williams,* for appellees.

*Satterfield, Ewing, Williams & Shell,* for Stanolind Oil & Gas Company.

LEE, J.

Ethel C. Martin and others, as complainants, sought by their bill of complaint to be declared the true owners of a parcel of land therein described, and to have cancelled any and all claims thereto by E. A. Ball and others, who were made defendants. By their answer, the de-

fendants asserted that they had obtained title to the land in question by adverse possession. At the conclusion of the hearing, the prayer of the bill was granted, and, from the decree entered, the defendants appeal.

The land in controversy consists of 20 acres, described as the E½ of NE¼ of SW¼ of Section 19, Township 2 N, Range 14 E. The complainants are the successors in title to Southern Pine Company, a corporation, and are the owners of the record title.

To sustain their claim of title by adverse possession, the defendants offered proof to the following effect: The residence of E. A. Ball, where he has lived with his family for many years, is situated in the NE¼ of the above described section on the west side of; and adjacent to, a public road running approximately north and south. In the late twenties or early thirties, more than 10 years before the institution of this suit, Ball erected a fence along and parallel with the public road. At the north end thereof, he built a fence in a westerly direction to the section line between sections 13 and 18, and ran it thence south to the right-of-way of the Gulf, Mobile & Ohio Railroad, where he tied it in with the railroad fence. From the south end of the fence along the public road, he erected another fence in a westerly direction and in a circuitous route and also tied it in with the railroad fence. Thus by erecting fences on three sides and using the railroad fence, he enclosed a large area, approximating several hundred acres. The 20 acres here in question was not separately fenced as such, but was embraced within the large enclosure. Ball pastured his cattle in the enclosure and permitted others to do so, and the cattle, of course, grazed on the 20 acres. He furnished the lumber and paid several workers to build a small house on the 20 acres, and it was occupied by his tenants, and was used for other purposes. He removed paper wood, oak timber for fire wood, sold pine stumps, and operated several charcoal kilns thereon. He built

and maintained a road running from his home in a westerly direction across this land to Saxon's Spur on the railroad. At first there were gates at each end, but later, he substituted cattle gaps. In 1943 and subsequently, he executed mineral leases on this land. It was assessed to him and he paid the taxes thereon for the last year or two before the institution of this suit on September 10, 1948. Other minor acts of possession could also be enumerated, but it is deemed to be unnecessary.

Suffice it to say, the proof was ample to show that Ball exercised a number of acts of possession over this land for more than ten years before the filing of the suit.

To offset the effect of the foregoing acts of possession, and to show that Ball, in doing so, was not asserting a hostile and adverse claim against the owner and was not claiming to be the owner himself for that time, the complainants introduced proof as to his acts, conduct, declarations and statements as follows:

This land was acquired by Southern Pine Company in 1889, and it, and other lands, were assessed to that corporation in 1933. The taxes were not paid, and "30 A. NE of SW" of Section 19 was sold to the State. On July 28, 1939, at a time when the 20 acres in question had already been in the enclosure for a considerable period of time, Ball applied, under oath, to the Land Commissioner to purchase 30 acres in NE¼ of SW¼ & SE¼ of SW¼, Section 19, Township 2, Range 14 in the County of Marion. He gave the names of Mike Jones, Harry Owens, Arlee Johnson and E. A. Ball, as owners of land on the west, south, north and east, respectively. He gave Southern Pine Company as the owner, and the one to whom it was assessed, at the time of sale. To the inquiry under special information, "interest of applicant in land (owner, mortgagee, etc.)" his answer was "None". Thereafter on September 16, 1940, the patent

was issued. No doubt Ball, at the time, thought he was getting a parcel of land which embraced the 20 acres; but later, in another proceeding, the chancery court, by decree of date of June 30, 1945, held that the description was insufficient and cancelled the tax sale.

On August 8, 1938, Ball applied to the State for a patent to the W½ of SE¼ of the same section, giving, under oath, Southern Pine Company as owner and the one to whom it was assessed at the time of the sale to the State. Most of this land had been within the enclosure for many years. On June 7, 1943, he applied to the State for patents to the NW¼ of NE¼ and the NW¼ of NW¼ of the same section, giving, under oath, Southern Pine Company as owner and the one to whom it was assessed at the time of the tax sale, and stating that his interest therein was "None". Most of this land had been within the enclosure for a number of years. On July 6, 1944, he filed a disclaimer in the office of the Chancery Clerk of Marion County, in which he stated that H. L. Rankin, not he, owned the 15 acres therein described. A part of this acreage had been within the enclosure for a number of years.

Lee B. Agnew testified, in effect, that on July 15, 1948, while he was investigating the title, Ball and his son, Otis, went with him in his car to this land; that he went upon the land and pointed it out as the property that he was interested in; that Ball then told him that this land had belonged to a negro by the name of Jake Johnson; that Jake had cut the timber and sold it, and had burned charcoal off of it; that Jake had given Joe Skelvin permission to build the little house, and that he, Ball, had furnished the materials that went into it; and that he, Ball, had been claiming the land since it was conveyed to him, after the death of Jake Johnson, by Arlee Johnson. Otis Ball admitted that he and his father went with Agnew near this land but claimed that they stopped at the house where Jake had lived. He denied

that his father made the foregoing statement, and denied that the 20 acres was mentioned. The deed from Arlee Johnson to E. A. Ball, dated December 2, 1939, conveyed the N½ of NE¼ of SW¼ and other lands in the section, and manifestly embraced a part of this 20 acres; but a subsequent deed, with the same grantor and grantee, dated December 5, 1941, did not embrace any part of it.

In consequence of the proof as to Ball's acts, conduct, declarations and statements subsequent to the enclosure of the area under fence and his exercising other possessory acts thereover, the question arose as to his purpose and intention in so doing, that is, was he, in so doing, asserting a hostile and adverse claim against the real owner and claiming to be the owner himself for that time, or was his possession permissive or taken merely as a matter of convenience to him. Obviously he knew better than any other person what he purposed and intended. No one attempted to explain his declarations, under oath, of no interest in lands which he sought to patent, and which lands were wholly or partly within his enclosure. It seems unlikely that anyone else could have reconciled the discrepancies between those declarations and a claim of adverse possession. He did not testify as to those matters, nor did he deny the import of Agnew's testimony.

At the beginning of the trial, on a showing that he was unable to attend, the court conducted a hearing as to his then physical condition. It was disclosed that he was 80 years of age, and had suffered from a heart ailment since 1944. However, the doctor testified that "his heart is some better now" than it was when he first started treatment. The trial judge himself made inquiry of the doctor, and the question and answer were as follows: "Q. But you think if the court went down with the court reporter and two lawyers and not aggravate him, it would not be dangerous to his health? A. I think that would be all right. I don't think there would be any

danger in that. It would be fair and all right to both sides." Counsel for the complainants offered to have one of their attorneys with the court reporter and an attorney for the defendant to go to Ball's home and take his testimony, but counsel for the defendants declined such offer. The trial judge, in his memorandum opinion, referred to the great difficulty in deciding the case because he did not have the benefit of this testimony.

Under the provisions of Section 711, Code of 1942, the vesting of title to land by reason of ten years actual adverse possession thereof enures to the benefit of any person "claiming to be the owner for that time . . ."

As early as 1855 in the case of Adams v. Guice, 30 Miss. 397, this Court said: "It is well settled that, in order to constitute an adverse possession, so as to confer a right to the party holding it, or rather, so as to bar a recovery by another party claiming title, the possession should be under a claim of right. The reason is said to be, that it may not have been originally taken, or subsequently held, with an intention to claim the property as owner; and may have been with a perfect understanding between the possessor and the proprietor, that the latter is all the time to be regarded as such; or in other words, that the possession may be regarded as permissive."

In Davis v. Bowmar, 55 Miss. 671, at page 765 thereof, the Court said: "To acquire a title by possession two things must concur, to-wit, an occupation, actual or constructive, and a claim of ownership. Neither is effectual without the other. No continuance of occupation, no matter how long protracted, will avail unless accompanied by claim of title; and every presumption of law is that the occupant holds in subordination, and not adversely, to the true owner."

Of course "a mere intruder, who enters and holds land, without color of title, for the period prescribed by the Statute of Limitations, may rely upon the statute to

the extent of his actual occupation and inclosure, but no further." Welborn v. Anderson, 37 Miss. 155. See also Levy v. Campbell, 200 Miss. 721, 28 So. 2d 224, which cites and approves the rule announced in Welborn v. Anderson, supra.

The distinction between the respective burdens of claimants under color of title and by adverse possession was clearly pointed out in the case of Bullock v. Greer, 181 Miss. 190, 179 So. 264, where the Court said: ". . . a person in possession of part of a tract of land, by having possession of that part, will be deemed to be in possession of all the land called for in the deed, providing no other person is occupying it; but possession does not extend beyond the calls, and, to obtain title by adverse possession to land outside of the calls of one's deed, there must be actual and exclusive adverse occupancy *under claim of right or ownership.*" (Emphasis supplied). See also McCaughn v. Young, 85 Miss. 277, 37 So. 839; Southern Naval Stores v. Price, 202 Miss. 116, 30 So. 2d 505.

In Neal v. Newburger Co., 154 Miss. 691, 123 So. 861, as to the burden of proof necessary to establish title by adverse possession, this Court said: "The burden of proof to establish title by adverse possession is upon the claimant of such title. He must show by a preponderance of the evidence that his possession was adverse and open, and under a claim of right, and for the required length of time."

In this case, Ball had no color of title. He could therefore claim only by reason of adverse possession, and to prevail, he must have had the intention "to appropriate and use the land as his own to the exclusion of all others, irrespective of any semblance or shadow of actual title or right". 1 Am. Jur., Adverse Possession, Section 185, page 894. Compare also Sumrall v. State, 209 Miss. 761, 48 So. 2d 502.

██ Since he did not testify as to what his intention was, and since his statements hereinabove referred to leave in serious doubt whether he was in fact claiming this 20 acres of land adversely for 10 years or more prior to the institution of this suit, it follows that he failed to meet the burden required of him by the law.

██ The proof by the appellants was that the road from Ball's house to Saxon's Spur had been maintained for 12 years or more. Appellees' in their questions about this road, indicated that they regarded it as a public road, and sought to show thereby that it was traveled by many persons and vehicles without objection from Ball. However, the final decree provided that the defendants "are hereby perpetually enjoined from going upon said land, fencing or using the same in any manner, or otherwise interfering with complainants in the possession and use of said land." To the extent of enjoining the appellants from the use of this road, the final decree was in error, and it is therefore modified so as to permit the appellants to use the road.

From what has been said, it follows that the decree should be and is modified so as to permit the appellants to use the road in question, and, as modified, the decree is affirmed. Costs are apportioned three-fourths to appellant and one-fourth to appellee.

Affirmed as modified.

*Holmes, Arrington, Ethridge* and *Lotterhos, JJ.,* concur. *Roberds, P. J.,* took no part.