NEWMAN *v.* SMITH, et al.

No. 39823 January 16, 1956 84 So. 2d 512

*Morse & Morse,* Poplarville, for appellant.

*Hall & Callender, Maurice Dantin,* Columbia; *H. H. Parker,* Poplarville, for appellees.

KYLE, J.

This case is before us on appeal by Joe H. Newman, defendant and cross-complainant in the court below,

from a decree of the Chancery Court of Pearl River County, in favor of G. Spencer Smith and others, complainants and cross-defendants, cancelling all claims of the said Joe H. Newman and his codefendants to a tract of land in Sections 8 and 9, Township 2 South, Range 17 West, containing approximately 151 acres, which was conveyed to the said complainant, G. Spencer Smith, by J. J. White Lumber Company by warranty deed dated June 20, 1946, and dismissing with prejudice the defendants' cross bill.

The record shows the following facts which constituted the basis of the complainants' claims of title, as set forth in their bill of complaint. The 151-acre tract of land described in the bill was formerly owned by J. M. Newman, the appellant's father, who conveyed the land by warranty deed to Salmen Brick and Lumber Company, Ltd., on March 23, 1923. The deed which was executed by J. M. Newman and his wife to the Salmen Brick Company contained a reservation of pasturage rights as follows: "It is also understood and agreed that grantors are to have the right to continue to use the pasture as now erected and in use of said Lot 7, Section 8, to use same as tenants at will of the grantee, of course, to acquire no rights to the freehold by reason of the use of said pasture." On May 10, 1926, Salmen Brick Company conveyed the land by warranty deed to J. J. White Lumber Company; and on June 20, 1946, J. J. White Lumber Company conveyed the land to G. Spencer Smith by warranty deed, excepting, however, the oil, gas and minerals which had been theretofore conveyed to A. T. Stewart. The Atlantic Refining Company was the owner of an oil, gas and mineral lease on the land at the time Smith purchased the land from the lumber company.

The bill of complaint in this cause was filed on July 5, 1948, by G. Spencer Smith, A. T. Stewart, The Atlantic Refining Company and J. J. White Lumber Company,

as complainants, against Joe H. Newman, J. M. Morse and J. M. Morse, III, as defendants. In their bill the complainants deraigned a record title to the land; and the complainants then alleged that within the last ten years next preceding the filing of the bill the defendant Joe H. Newman had entered upon the land and had erected a fence on a portion of the land and had undertaken to take the same into his possession, and was claiming it as his own. The complainants further alleged that the said Newman had no deed to the land or color of title, but claimed the same by virtue of his alleged adverse possession of the surface of a portion of the land; and that the complainants were entitled to a decree cancelling his claim to the land and quieting and confirming the complainants' title. The bill further alleged that the defendants, J. M. Morse and J. M. Morse, III, had obtained a quitclaim deed from the defendant, Joe H. Newman, which purported to convey to them an undivided one-half interest in the land, and that the complainants were entitled to have that deed also cancelled.

The prayer of the bill was that a decree be entered cancelling the claims of all the defendants to the lands and confirming the complainants' title.

The defendants in their answer denied the complainants' claim of title, and as an affirmative defense averred that Joe H. Newman had gone into possession of the land on or about April 29, 1934, claiming the same as his own, and had acquired title to the land by adverse possession for a period of more than ten years. The defendants made their answer a cross bill and asked that their title be confirmed.

After numerous postponements, the cause was finally heard by the chancellor, at the May 1954 term of court, upon the pleadings and proof.

Upon the hearing the complainants made proof of their record title, and the complainants then called Joe H. Newman to testify as an adverse witness.

Newman testified that after his father and mother had conveyed the land to the Salmen Brick Company in 1923, they continued to pasture their cattle on that part of the land which his father had under fence until his father's death in 1934, and that neither the brick company, while it owned the land, nor J. J. White Lumber Company, after it acquired title to the land in 1926, interposed any objection to J. M. Newman using the land for pasturage purposes. Newman then stated that after his father's death he repaired and rebuilt the fences around the tract of land which his father had under fence, and continued to use the land thus enclosed for pasturage purposes down to the date of the filing of complainants' bill in 1948. Newman admitted that he had personal knowledge of the clause contained in the warranty deed which his father and mother had executed to the Salmen Brick Company in 1923 giving them the right to continue to pasture their cattle on the land as tenants at will of the Salmen Brick Company.

Newman testified that the fence which he repaired and rebuilt enclosed only 35 or 40 acres of the 151-acre tract. He admitted that he had no paper title, or record title, to any part of the land, and that he did not intend to claim title in his cross bill to the entire tract, but only that part of same which he had under fence. He admitted that the J. J. White Lumber Company acquired title to the land from the Salmen Brick Company in 1926, and that the lumber company had had the land assessed to it, and had paid the taxes on the land each year thereafter until the land was sold to G. Spencer Smith; and that Smith had had the land assessed to him and had paid the taxes on the land since 1946; and he admitted that he had never had any part of the land assessed to himself as the owner thereof.

Newman testified that, after Smith purchased the land from the lumber company in 1946, he talked to Mr. Smith several times about purchasing the land from him, and

that he tried to buy that part of the land that he had under fence. Newman was then asked the following questions and made the following answers: "Q. But you offered him $5.00 an acre for the forty acres set up under your fence? A. Yes, sir. Q. Which would be $200. A. Yes, sir. Q. And you made that offer to Mr. Smith several times? A. Yes, sir. Q. And you would have been glad to do that? A. Yes, sir, that's all I wanted. Q. The fact is, Mr. Newman, that when you first talked to Mr. Smith about this land you told him that then 'I was planning to buy that land from the lumber company?' A. Yes, sir. Q. You made that statement several times? A. They knew I was going to buy it when I got the money. Q. He knew that you were going to buy it from the lumber company when you got the money? A. Yes, sir. Q. Is that one of the reasons you hadn't already brought it? A. Yes, sir." Newman admitted that during the thirties, when Mr. H. L. White, who was president of the J. J. White Lumber Company, was Governor, and also during the forties, he had spoken to Earnest Ford, who had served as land agent of the lumber company, about buying the land, and that he had asked Mr. Ford to "put in a word for him" for the land. Newman also stated that he told Mr. White's secretary that he wanted the land when he got the money, and Mr. White's secretary told him he would sell it to him, and he said, "No, you might get a chance to sell it to somebody else." He said that he could not recall when he made that statement, but he did make the statement. Newman stated that when he finally got the money and went to Columbia in 1946 to buy the land he found out that Mr. Smith had already bought it.

Upon direct examination by his own attorney, Newman stated that he had kept trespassers off the land during the time that he had had it in his possession, and had protected the land from timber cutters. He stated that the reason he offered to buy the land from Mr.

Smith was that he did not want to go to court. Upon further cross-examination by the complainants' attorney, he stated that when he rebuilt the fence in 1934 after his father's death, he knew the land was not his land, and the reason for rebuilding the fence was that he needed the land for pasturage purposes.

The complainant, G. Spencer Smith, testified that after he purchased the 151 acres of land from J. J. White Lumber Company in 1946 the defendant Newman came to his house and talked to him several times about the land. Newman told him that he had expected to buy the land, that some of it was in a pasture that he had been using, and that he would give him his money back if he would let him have the land. Smith stated that he offered to sell to Newman the land that he had under fence for $10 per acre, but Newman was unwilling to pay that price for it. Newman offered Smith $5 per acre, which Smith declined to accept. Smith testified that at the time Newman talked to him about buying the land there was no threat of a lawsuit between them.

After the complainants and rested their case, Joe H. Newman was recalled to testify in his own behalf, and upon direct examination by his own attorney he stated that he began to claim the land that he had under fence as his own after his father's death in 1934, and that he had kept it fenced since that time. Three other witnesses also testified that after J. M. Newman's death Joe H. Newman repaired and rebuilt the fence around the tract of land that his father had been using for pasturage and kept trespassers out.

The chancellor found that the complainant, G. Spencer Smith, was the owner, in fee simple, of the 151 acres of land in controversy, less and except the oil, gas and minerals in and under the land; that the complainant, A. T. Stewart, was the owner of the oil, gas and minerals on the land; and that The Atlantic Refining Company was the owner of a valid and subsisting oil, gas and min-

eral lease covering the land; and that the defendants and cross-complainants had no right, title or interest of any kind in the land. The chancellor entered a decree confirming the complainants' title in and to their respective interests in the land, and cancelling the defendants' claim as a cloud upon the complainants' title; and the chancellor dismissed the defendants' cross bill with prejudice.

The appellant argues only one point as ground for reversal of the chancellor's decree, and that is, that the chancellor erred in his finding that the appellant had not acquired title by adverse possession to the land that he had had under fence since 1934.

 But we think there was no error in the chancellor's finding that the appellant had not acquired title to the land by adverse possession. The appellant admitted that he had no title to the land at the time he rebuilt the fences after his father's death in 1934. The appellant knew that the lumber company owned the land at that time, and although he continued to use the land for pasturage purposes, he made no adverse or hostile claim of ownership of the land until after he learned that Smith had purchased the land from the lumber company in 1946. The appellant testified that he had told Mr. White's secretary that he wanted to buy the land when he got the money; and the appellant admitted that he told Mr. Smith after Mr. Smith had bought the land that he was planning to buy the land himself when he learned that Mr. Smith had bought it. The appellant's own testimony clearly indicates that his possession and occupancy of the land after his father's death was permissive, and subservient to the title of the rightful owner.

The rule is that the possession of land by one who enters on the land with the consent of the owner is not adverse to the owner, and cannot ripen into a valid title by lapse of time. Adams v. Guice, 30 Miss. 397.

Permissive possession, even if long continued, does not confer title on the person in possession of the property. Barron v. Federal Land Bank of New Orleans (1938), 182 Miss. 50, 180 So. 74, and cases cited.

In the case of Davis v. Bowmar, Executor, et al., (1878), 55 Miss. 671, the Court said: "To acquire title by possession two things must occur, to-wit, an occupation, actual or constructive, and a claim of ownership. Neither is effectual without the other. No continuance of occupation, no matter how long protracted, will avail unless accompanied by claim of title; and every presumption of law is that the occupant holds in subordination and not adversely, to the true owner. Not only does the law presume that he who has entered without title has done so in recognition of, and subordination to, the title of the owner, but, having affixed this prima facie presumption to his entry, it will not allow him to convert it into an adverse one except by acts which plainly demonstrate its hostile character."

"The doctrine of prescription does not apply to cases in which possession is permissive, and title by prescription or limitation cannot be based upon a possession or use under permission or license from the owner. The possession of the occupants under such circumstances is considered as the possession of him upon whose pleasure it continues." 2 C.J.S. p. 624, Adverse Possession, par. 80.

In the case of Neal v. Newburger Co., 154 Miss. 691, 123 So. 861, the Court said: "The naked possession of land, unexplained, is presumed to be in subordination to the rightful title; and that is true without regard to the length of the possession. Presumptively the possession is in subservience to the title of the rightful owner. The burden of proof to establish title by adverse possession is upon the claimant of such title. He must show by a preponderance of the evidence that his possession was adverse and open, and under a claim of right, and

for the required length of time. Adams v. Guice, 30 Miss. 397; Green v. Mizelle, 54 Miss. 220; Rothschild v. Hatch, 54 Miss. 554; Dean v. Tucker, 58 Miss. 487; Leavenworth v. Reeves, 106 Miss. 722, 64 So. 660.''

In the case of Ball v. Martin, 217 Miss. 221, 63 So. 2d 833, the Court held that where a party has no color of title to land and could claim it only by reason of adverse possession, he must, in order to prevail, have had the intention to appropriate and use the land as his own to the exclusion of all others, irrespective of any semblance or shadow of actual title or right. See also Grantham et ux. v. Masonite Corp., 218 Miss. 745, 67 So. 2d 727.

In this case, as in Neal v. Newburger Co., supra, and Ball v. Martin, supra, the appellant had no color of title. He could therefore claim only by reason of adverse possession, and to prevail he must have been able to show by a preponderance of the evidence that his possession was ''adverse and open and under a claim of right'', and that he had the intention ''to appropriate and use the land as his own to the exclusion of all others, irrespective of any semblance or shadow of actual title or right.'' Not only did the appellant's testimony fail to show that his possession of the land was adverse to the title of the lumber company, but the testimony, in our opinion, showed exactly the contrary.

No more convincing proof could have been offered to show that the appellant's possession of the land was not adverse to the title of the lumber company, but was merely permissive, than the appellant's own statement that he had told Mr. White's secretary that he wanted to buy the land when he got the money, and that he went to Columbia to purchase the land from the lumber company a few days after Smith got his deed, and found out at that time that Smith had acquired title to the land, and that he then tried to buy the land from Smith, and offered Smith $5 an acre for the 40 acres under

fence, which was the price that Smith had paid to the lumber company for the land.

The decree of the chancellor in our opinion is supported by the weight of the evidence, and is therefore affirmed.

Affirmed.

*McGehee,* C.J., and *Lee, Arrington* and *Gillespie,* JJ., concur.